IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-00094-MEH

ANDRIA LEIGH LENOBLE,

      Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Plaintiff applied for Title II disability insurance benefits under the Social Security Act ("SSA"), 42 U.S.C. § 1383. An Administrative Law Judge ("ALJ") rendered a decision finding Plaintiff not disabled under the SSA's definition. The Appeals Council denied her Request for Review, thereby leaving the ALJ's decision final and subject to judicial review. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist in the appeal's determination. After reviewing the parties' briefs and the administrative record, the Court affirms the ALJ's decision.

## BACKGROUND

      Plaintiff has a four year college education in the subjects of chemistry, biochemistry, and molecular biology as well as a Master of Science degree in healthcare administration. ECF 5 at 49, 229, 236, 821. Through 2010, she had various jobs in the science field. *Id*. at 266. After taking extended medical leave following a cycling accident in 2010, her then employer replaced her. *Id*.

1

at 46. In 2011 and 2012, she worked as an engineer for a medical device manufacturer. *Id*. at 230. From March 2013 until the end of 2018, she worked for the Colorado Regulatory Board as a hospital regulatory specialist in child cancer research. *Id*. at 45-46, 230. The medical record during this period of time, from March 2010 to May 2017, is limited to occasional dermatology appointments for a variety of medical and cosmetic treatments. *Id*. at 345-380. She would continue to see the dermatologist on a regular basis for the remainder of the treatment history.

The Plaintiff had undergone bone surgery in her feet several years earlier. On May 24, 2018, Plaintiff went to Dr. Eustaquio for an evaluation of a possible non-union of bones in her right foot. *Id*. at 446. Testing revealed an allergic reaction to the stainless steel in the implant used to hold that bone union together. Dr. Eustaquio planned for surgery to replace the stainless steel implant with a titanium one after noting the lack of an allergic reaction to a separately used titanium screw in a foot bone. *Id*. at 440, 444, 804.

In June 2018, Plaintiff obtained a renewed Albuterol prescription for her asthma. *Id*. at 445. That prescription would remain active for the rest of treatment history. In August 2018, Plaintiff sought chiropractic and message therapy for neck and upper body pain that she attributed to the 2010 cycling injury. *Id*. at 438-39. In September 2018, Plaintiff returned to her rheumatologist for a check-up on her longstanding psoriatic arthritis. She was not experiencing arthritic joint pain despite unilaterally ceasing her methotrexate medication. Plaintiff attributed her neck pain to degenerative orthopedic changes instead. The physical examination revealed no significant orthopedic pain complaints. *Id*. at 424. On September 12 and again on October 30, 2018, Plaintiff sought care for a left eye vision complaint and related headache. *Id*. at 428-434. At the October 30, 2018 appointment, the complaint was attributed to her eyeglasses and how she was wearing

them. *Id*. at 401.   Plaintiff would continue to seek medical care for the above conditions for the remainder of the treatment history.

At pre-surgery screening appointment on September 26, 2018, Plaintiff reported that she walks and bikes. She reported no other medical complaints. *Id*. at 420. The planned fusion surgery on Plaintiff's right big toe was performed on October 12, 2018 at which time she received a bone graft and a titanium plate and screw. *Id*. at 403.

The first mental health treatment record comes from Plaintiff's visit to Dr. Clinch on September 6, 2018. She reported a longstanding history of depression for which she has taken Prozac. The medication had become less effective over time, however. *Id*. at 436. Plaintiff returned to Dr. Clinch on October 8, 2018. She complained of an increase in anxiety caused by conflict with her supervisor as well as depression-related symptoms such as tiredness and lack of motivation. She also reported a long history of post-traumatic stress disorder ("PTSD") from childhood triggered by the smell of smoke. The mental status evaluation was normal including cognitive functioning although her mood was depressed and anxious. Dr. Clinch diagnosed a mood disorder and PTSD. Dr. Clinch continued her Prozac as well as her Remeron (given as a sleep aid) to which he added a trial prescription for Lamotrigine for possible bipolar disorder. Dr. Clinch lastly advised mental health therapy. *Id*. at 412-418. Plaintiff was 49 years old at the time of this appointment.

Plaintiff returned to Dr. Eustaquio on December 3, 2018 complaining of swelling in her right foot around the surgery area. At preceding appointments, Plaintiff had reported continued weightbearing activity in the form of sleepwalking. The examination was overall normal. Dr. Eustaquio advised continued monitoring over the next four to five months. *Id*. at 393.

Plaintiff's employment as a hospital regulatory specialist ended in early December 2018. She quit that job because of her long commute and the resulting pain from the prolonged sitting. *Id*. at 249. By mid-December, she had found a new job as a patient access representative and admissions clerk at the front desk of presumably a different hospital. *Id*. at 230, 571.

Treatment records from December 2018 to May 2019 show ongoing medical care for a variety of physical health conditions. She continued to see a rheumatologist for mild swelling in her hands (*id*. at 555-557, 571, 583) as well as a dermatologist (*id*. at 551-552, 558, 577). She frequently saw a chiropractor, often for back and neck pain flare-ups after carrying her dogs or working on her butterfly hobby. *Id*. at 548, 691-695. She underwent Lasik surgery on both eyes in February 2019. *Id*. at 564. She saw Dr. Graff, a general practitioner, for a variety of other complaints. *Id*. at 559, 580-582, 568. Her various longstanding ailments remained stable and well-controlled. *Id*. at 540. Plaintiff complained about swelling around her right foot surgery site and expressed concern about another allergic reaction. Physical examinations were normal. *Id*. at 546, 551-552, 559, 571, 612. The Court notes that Plaintiff pursued no mental health treatment during this period of time, however.

Plaintiff quit the hospital admissions clerk job on May 8, 2019. *Id*. at 195. She describes her employer's frustration with the frequency of her doctor appointments (*id*. at 43, 49, 248), and she felt forced to quit in order to make an appointment regarding her right foot. *Id*. at 229. Plaintiff claims May 8, 2019 as her date last work, but she did not stop all employment activity. Later that same month she began a part-time job as a barista at a coffeehouse chain. *Id*. at 266. She also pursued self-employment in the medical device consulting field (*id*. at 43-44, 698, 932), the same self-employment work her husband does (*id*. at 822).

Plaintiff applied for disability benefits on May 31, 2019. *Id*. at 195. She claimed disability due to a very wide range of physical health ailments. She included in her claim the mental health impairments of depression and PTSD. *Id*. at 236.

Although the titanium implant was causing no complications, she requested its removal. Because the bone had fully fused in the meantime, leaving no need for the implant to remain, it was removed on May 30, 2019. *Id*. at 519, 524, 528, 603. There was no complications during her post-surgery recovery. *Id*. at 787. Indeed, contemporaneous chiropractic treatment notes indicate ongoing home and work activity without complaints about interfering foot pain. *Id*. at 700.

Various radiographs taken in May 2019 showed her foot to be overall normal and only mild degenerative changes in her cervical spine. *Id*. at 386, 599-600, 603-604. Nevertheless, epidural steroid injections to her cervical spine which had been successfully given several years earlier were resumed on May 31, 2019 to treat a back pain flare-up. *Id*. at 518, 532. Plaintiff complained of a neck and right foot pain flare-up from a car accident that occurred on June 11, 2019. Radiographs continued to show minimal degeneration with a moderate degree of spondylosis in her cervical spine. *Id*. at 514, 595-596, 890. "Gentle conservative chiropractic care" was the recommended form of treatment. *Id*. at 700.

The treatment record resumes on December 10, 2019 when Plaintiff again sought back pain which she attributed to the car accident. The attending physician recommended that her medications be adjusted to treat both her pain and depression jointly. *Id*. at 837-840.

The Commissioner sent Plaintiff to Dr. Kamer for a consultative physical examination on December 23, 2019. Both his physical examination and mental status evaluation were normal. *Id*. at 811-817. Dr. Kamer also rendered an opinion about Plaintiff's ability to perform the physical aspects of work. *Id*. at 817.

Plaintiff saw Dr. Campbell on January 6, 2020 for a consultative psychological evaluation. She attributed her primary work-related impairments to her physical health condition. For example, she said that customers become frustrated with her slow pace, which she attributed to hand use problems. *Id*. at 820, 827. As for mental impairments, she described difficulty getting out of bed in the morning, and she occasionally finds herself in "bad funks." She is not receiving mental health care, and she conceded that exercise can ease her depression symptoms. The mental status evaluation was normal except for mild anxiety. Dr. Campbell diagnosed PTSD with secondary depressive episodes and situational anxiety. *Id*. at 819-828.

Three weeks later, on January 28, 2020, Plaintiff went to the emergency room because of an increase in depression symptoms and suicidal ideation (having felt the urge to drive her car into a tree earlier that day while driving). *Id*. at 888. Plaintiff agreed to leave the hospital and go to a mental health clinic for a psychological evaluation. She did not stay at the mental health clinic for the evaluation however, leaving when staff said her mental health diagnosis loudly enough for others to overhear. *Id*. at 886-887.

A hospital nurse called Plaintiff on January 29, 2020 to check on her status. Plaintiff explained that she had gone to the emergency room "after having a 'thought' of running her car into a tree," but without an actual desire to kill herself. She attributed the suicidal thought to increased depression and chronic pain," "having 'scary dreams and thoughts,'" and having "a bad day [that day]." *Id*. at 886.

At a follow-up appointment on January 30, 2020, Plaintiff described a two-week spell of increased depression symptoms in the form of cognitive-type difficulties and poor focus, nightmares, difficulty waking up in the morning, and anhedonia. A moderate episode of recurrent major depressive disorder was diagnosed. By February 6, her depression was described as

6

improved and in partial remission. The addition of Wellbutrin was helping, including with her focus. The need for Plaintiff to begin therapy was stressed. She was referred to various providers, and placed on a waiting list for one. *Id*. at 876, 880-882. At an appointment on March 5, 2020, she reported ongoing difficulty with starting her day and lack of motivation. Plaintiff's psychotropic medications now consisted of Lyrica, Cymbalta, and Wellbutrin as well as Remeron as a sleep aid. Dr. Graff diagnosed depression of moderate severity. *Id*. at 867.

By March 31, 2020 the focus of Plaintiff's mental health complaints shifted from depression (which had improved) to the anxiety she was experiencing over the COVID-19 outbreak. She was concerned about going to her coffeehouse job with a suppressed immune system from ongoing psoriatic arthritis medication. Dr. Graff again stressed the need for mental health counseling, referring her to a telehealth provider or a county program. *Id*. at 932. At the May 26, 2020 appointment with Dr. Graff, she repeated her COVID concern about going out in public. Dr. Graff diagnosed mild depression and anxiety and strongly encouraged her to seek counseling. *Id*. at 920. On May 3, 2020, Plaintiff had gone to a restaurant for a meal (for which she sought treatment for a swollen lip after an allergic reaction to salad dressing). *Id*. at 924.

Plaintiff continued to see her chiropractor on a frequent basis. Those treatment notes which run through 2020 show that she remained physically active, working in her yard and garden as well as on house maintenance. She also continued to work at her job and to use her computer. *Id*. at 979-1037, 1053-1100. Later, during the summer of 2020, Plaintiff drove her daughter to college from Colorado to the east coast in an RV. *Id*. at 1092-1094. In August 2020, Plaintiff attended an outdoor concert. *Id*. at 1150-1151. In October 2020, she went to a job interview and also helped her father move residences. *Id*. at 1069-1070.

Plaintiff saw Dr. Graff for a variety of physical health complaints on July 20, 2020. As for her depression and anxiety, it was described as stable and well-controlled. *Id*. at 1178. Plaintiff began treatment with a new physician on October 12, 2020. Moderate depression was diagnosed at that appointment. A week later she went to a depression care management appointment. She reported feeling down over recent news, and she was tear gassed while participating at a political rally. Plaintiff said that she found mental health therapy to be generally unhelpful, and she declined further services at the depression care management clinic. She preferred to limit mental health care to her psychotropic medication regimen with which she was satisfied. *Id*. at 1348-1351.

Plaintiff began a full-time consulting job in March 2021. She was fired in early May because of poor hearing (which hindered her ability to participate at meetings) and difficulty taking notes (because of hand pain). *Id*. at 53-54. Plaintiff continued to work part-time as a coffeehouse barista. *Id*. at 42.

Plaintiff sought ongoing medical care for a wide range of physical health ailments through April 2021. Those treatment notes contain no more mention of mental health complaints, however. *Id*. at 1273-1515.

Plaintiff testified at the hearing held on May 18, 2021. She was fifty-two years old at the time. *Id*. at 40. Plaintiff claimed disability due to a wide variety of medical conditions and impairments. She also described a fairly broad range of daily life activities, including driving regularly to work and medical appointments; shopping; and attending her daughter's hockey games. She can follow written instructions fairly well (depending on her vision), and she can tolerate stress and changes in the routine. Also testifying was a Vocational Expert ("VE") who opined about job options amenable to different limitation hypotheticals.

## **THE FIVE-STEP PROCESS FOR DETERMING DISABILITY**

To qualify for SSA benefits, the claimant must meet be insured, younger than sixty-five years of age, and disabled. 42 U.S.C. §§ 416(i), 423, 1382. A five-step sequential evaluation process guides the determination of whether an adult claimant meets SSA's definition of disabled. For SSA purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One asks whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments under 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant shows only a minimal effect on the ability to do basic work activities, he is not eligible for disability benefits. 20 C.F.R. 404.1520(c). Step Three tests whether the condition equates with a listed impairment deemed to be of disabling severity. 20 C.F.R. §§ 404.1520(d), 416.920(d). If a Listing is not met, then disability is not presumed, and the analysis progresses to an RFC assessment at Step Four. The RFC is an administrative determination based on the full evidentiary record of the most a claimant can do despite his or her impairments. 20 C.F.R. §§ 404.1545(a)(1), (a)(3), 404.1546(c). The RFC is used at both Step Four and Step Five. Step Four requires the claimant to show how his impairment(s) and RFC prevent him from performing his past jobs. If the claimant remains capable of previous employment, he is not disabled. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).

Finally, if the claimant establishes a prima facie case of disability at Step Four, the analysis proceeds to Step Five where the ALJ determines whether a claimant with the same vocational profile (age, education, work experience, and RFC) can perform other work in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).

## **ALJ's RULING**

At Step One of the disability analysis, the ALJ found Plaintiff's coffeehouse employment earnings to be less than what is needed to count as substantial gainful activity. *Id*. at 17. The Court notes that the ALJ did not include for consideration any income from her contemporaneous self-employment.

At Step Two, the ALJ determined Plaintiff to have the severe physical impairments of degenerative disc disease and stenosis of the cervical spine, psoriatic arthritis, connective tissue disease, and migraines. *Id*. The ALJ also found the severe mental health impairments of "depressive disorder versus bipolar disorder" and PTSD. *Id*.

Of the conditions that count as severe impairments, the ALJ found none to be of Listing-level severity to permit a Step Three finding of disabled based on the medical evidence alone. *Id*. at 20-21. The ALJ considered Plaintiff's mental health condition in terms of the four broad areas of mental functioning of the Psychiatric Review Technique ("PRT"), 20 C.F.R. § 404.1520a. For three of them, the ALJ found only mild impairment. In support thereof, the ALJ noted how Plaintiff's mental health condition generally has remained well-controlled, with no objectively observed significant cognitive deficits, normal social interactions with friends, family, and medical care providers, and substantially intact daily life activities and abilities. As for the fourth domain—concentration, persistence, and pace—the ALJ found a moderate degree of impairment. The ALJ

did so despite "no significant abnormalities in this area," but instead "giving her the benefit of the doubt." *Id*.

At Step Four, the ALJ assessed Plaintiff's RFC after reviewing the record evidence and testimony. The ALJ assessed Plaintiff capable of light work. Regarding Plaintiff's ability to perform the mental work demands of work, the ALJ limited her "to tasks that can be learned in six months," and found her able to "tolerate contact with coworkers, supervisors, and the public." *Id*. at 22.

In assessing the RFC, the ALJ noted Plaintiff's allegations of fatigue, daytime tiredness, poor motivation, frustration, and suicidal thoughts. However, the range of her daily life and other activities "contrast[ed] markedly" with the severity of the mental condition that she alleged. *Id*. at 23, 26. The treatment record showed "good control of [Plaintiff's] mental impairments" with medication adjustments, and the various mental status evaluations conducted were normal. Although the consultative psychological evaluation was overall normal, she experienced a two-week-long increase in symptoms shortly thereafter. Her depression eased over the following several months, although she experienced anxiety over the start of COVID. Overall, her depression and anxiety remained well-controlled. *Id*. at 26.

The ALJ also considered the medical opinion evidence of record. The ALJ found the two non-examining medical advisors to somewhat overstate the degree of mental impairment. Id. at 28. Likewise, the ALJ found the consultative source, Dr. Campbell, to somewhat overstate her mental impairment. The ALJ did not accept her opinion that Plaintiff's capacity for social interaction, responding appropriately to usual work situations, and routine work-place changes was limited to a moderate degree. The ALJ found those opinions "substantially inconsistent" with the psychologist's "largely intact exam findings[,] the other medical evidence documenting [her] well

11

controlled psychological symptoms[,] and normal mental status exams other than during a brief period in early 2020." *Id*. The ALJ reiterated the lack of "significant abnormalities of understanding, memory, concentration, or thinking." *Id*.

The ALJ found Plaintiff's RFC to permit her return to her past work as a hospital admitting clerk, which the VE classified as semi-skilled work performed at an SVP of four. *Id*. at 29. In making that finding, the ALJ relied on the VE's testimony and the *Dictionary of Occupational Titles*. *Id*.

Although Plaintiff's ability to perform past work warranted a finding of not-disabled, the ALJ nevertheless proceeded to Step Five to determine the availability of other jobs that also are amenable. After again relying on the VE's testimony and the *Dictionary of Occupational Titles*, the ALJ found the alternative jobs of cashier II, mail clerk, and general office helper amenable to a person of Plaintiff's RFC and vocational profile. Those three jobs, the ALJ furthered, involve an SVP of two. *Id*. at 29-30. As such, the Step Five inquiry also directed the conclusion of not disabled.

## STANDARD OF REVIEW

Judicial review is limited to two inquiries: (1) whether the correct legal standards were applied and (2) whether the final decision is supported by substantial evidence in the record as a whole. *Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).

Reversal is appropriate if the ALJ either applies an incorrect legal standard or does not demonstrate reliance on the correct one. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). If the ALJ applied the correct

standard in making a determination, then the Court considers whether the fact-findings enjoy evidentiary support.

A factual determination requires the support of competent substantial evidence from the administrative record. The term "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The threshold for such evidentiary sufficiency is not high: it is "more than a mere scintilla." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). In making that determination, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, the Court still must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

## ISSUE ON APPEAL

Although Plaintiff's disability claim centered on a wide variety of physical health ailments, the focus of her appeal concerns *mental* health. Plaintiff argues that the RFC that the ALJ assessed understates the degree of her mental impairment.

# ANALYSIS

## I.  Medical Source Opinions

The record contains no opinion statements about whether Plaintiff has any work-related mental impairments from any *treating* source. Indeed, there is very limited mental health treatment record at all; treatment was limited psychotropic medication refills from physicians. As such, the medical opinion evidence comes from consultative sources instead.

The first such medical source is Dr. Campbell, the psychologist who evaluated Plaintiff on January 6, 2020. Plaintiff highlights Dr. Campbell's description of her mood at that time as mildly anxious. She notes Dr. Campbell's opinion that she is moderately limited in her ability to perform understanding, remembering, and carrying out instructions as well as making judgments and decisions *at the complex level*. Dr. Campbell also described a moderate degree of limitation with respect to social tasks, responding appropriately to usual work situations, and tolerating routine work-setting changes. ECF 5 at 828.

On January 28, 2020 a non-examining agency medical advisor, Dr. Wharry, filled out a Mental Residual Functional Capacity Assessment ("MRFCA") form. Dr. Wharry found moderate limitation of Plaintiff's ability to carry out detailed instructions and maintain attention and concentration for an extended period of time. Dr. Wharry also found moderate limitation of Plaintiff's ability to interact appropriately with the general public. Otherwise, she saw no area of significant limitation. She expressed those limitations in terms of the ability "to persist at tasks that can be learned in up to six months on the job" and "have infrequent contact [with the] public." Dr. Wharry cited no specific item in the evidentiary record. Nor did she refer to Dr. Campbell's report. *Id*. at 81-82. On September 1, 2020, a second non-examining agency medical advisor, Dr. Frommelt, filled out the MRFCA form, answering it the same as Dr. Wharry. *Id*. at 101-102.

The ALJ considered the opinion evidence under 20 C.F.R. § 404.1520c (*id*. at 22), which is the standard that governs applications filed after March 27, 2017. Plaintiff filed her application in May 2019.

Under the new standard, an ALJ no longer defers or gives special weight to medical source opinion. Instead, the persuasiveness of an opinion from a medical source (of whatever kind whether a treating doctor or one-time examining consultant) is measured against certain factors. The two most important factors are (1) "supportability," which is the extent to which the source supports his or her opinion with objective medical evidence and an explanation, and (2) its "consistency" with the evidence from the other medical and nonmedical sources. 20 C.F.R. § 416.920c(b)(2) and (c)(1)-(2). *See also Miles v. Saul*, No. 20-cv-01456-WJM, 2021 WL 3076846, at *2-3 (D. Colo. July 21, 2021) (summarizing the new standard). In evaluating the ALJ's rationale for how persuasive a medical opinion is, the Court must "determine whether it is supported by such relevant record evidence as a reasonable mind might accept as adequate to support a conclusion." *Victoria Jean G. v. Kijakazi*, No. 20-4053-JWL, 2021 WL 4168124, at *5 (D. Kan. Sept. 14, 2021).

The ALJ correctly applied 20 C.F.R. § 404.1520c, specifically identifying the three sources of medical opinion evidence and explaining why she found them to overstate the degree of impairment. Plaintiff's objection instead concerns the ALJ's reasoning for finding those opinion statements less than fully persuasive and therefore not incorporating them completely into the RFC assessment.

Plaintiff contends that the ALJ impermissibly "second guessed" the medical sources by basing her determination on her own interpretation of the medical evidence. ECF 11 at 8-9. This "is precisely what the ALJ did in this case," Plaintiff contends, when the ALJ "rejected all opinion

15

evidence from mental health professionals who each found that [her] mental impairments are not only severe but also result in significant limitations." *Id*. at 9. This Court disagrees. First, this case does not present the situation of *Holgersen v. Comm'r*, No. 20-cv-00668-MSK, 2021 WL 2910655 (D. Colo. July 12, 2021), to which Plaintiff cites in support. *Holgersen* concerned the situation of an ALJ disagreeing with a mental health professional's diagnosis. Here, the ALJ accepted the diagnoses of record, finding at Step Two of the disability analysis that Plaintiff has the severe mental impairments of "depressive disorder versus bipolar disorder" and PTSD—a finding to which Plaintiff does not object. The second case to which Plaintiff cites, *Shanks v. Saul*, No. 20-cv-00314-RBJ, 2021 WL 423437, at *7 (D. Colo. Feb. 8, 2021) also is distinguishable because the ALJ here did include the impairing effects of a mental health condition in the RFC assessment. In short, the ALJ's consideration of Plaintiff's mental health condition and its impairing effect on her ability to work was significantly more thorough than the situations addressed in *Holgersen* and *Shanks*. In making this argument, Plaintiff also overstates the severity of the condition that the medical sources described.

Plaintiff says remand is warranted because "the ALJ impermissibly 'cherry picked' from the report of Dr. Campbell" to support giving her work-related opinion less than full weight. ECF 11 at 11. What information the ALJ selected from Dr. Campbell's report at the exclusion of disability-supportive information, Plaintiff does not identify. Nor after independent review of the Decision does the Court see an overly selective discussion of Dr. Campbell's report. The ALJ acknowledged *all* areas of moderate impairment that Dr. Campbell had opined. The ALJ regarded *some* of them as "substantially inconsistent with Dr. Campbell's largely intact exam findings." ECF 5 at 28. That is an accurate description of Dr. Campbell's evaluation. Other than the observation that Plaintiff "may have been mildly anxious at times" during the mental status exam

(*id*. at 824), Dr. Campbell reported no objective indication of mental, cognitive, or behavioral abnormality. The ALJ neither ignored material aspects of Dr. Campbell's report nor cherry picked only those aspects that would support a finding of not-disabled. As such, this case does not present the kind of reasoning defect that was at issue in her cited cases of *Bryant v. Comm'r*, 753 F. App'x 637 (10th Cir. 2018), *Hardman v. Barnhart*, 362 F.3d 676 (10th Cir. 2004), and *Robinson v. Barnhart*, 366 F.3d 1078 (10th Cir. 2004).

The ALJ described two ways in which Dr. Campbell's work opinion lacks support. First, there is its inconsistency with Dr. Campbell's own evaluation findings, which the Court discusses above. Second, there is its inconsistency with "the other medical evidence documenting [Plaintiff's] well controlled psychological symptoms and normal mental status exams." *Id*. at 28. Indeed, at several junctures in the Decision, the ALJ stresses how Plaintiff's mental health has remained overall well-controlled with medication and how mental status examinations indicated a generally mild condition over the full length of the treatment record. "The ALJ simply made [a] vague reference," Plaintiff complains, (ECF 11 at 10), and thus, it constitutes an inadequate basis for discounting all three medical source opinions and for finding her mental condition not disabling. This Court disagrees. The ALJ accurately summarized what the overall treatment record indicated about Plaintiff's mental health condition and its effect on her functional ability. Plaintiff does not explain how those particular findings are incorrect. Nor did the ALJ engage in cherry-picking. The ALJ acknowledged the period in early 2020 when Plaintiff experienced an increase in depression symptoms. The ALJ furthered how that was a single occurrence, still remained relatively mild in severity, and soon eased. *Id*. at 28.

Plaintiff identifies no defect in the ALJ's reasoning for regarding the work opinions as less than fully persuasive. Consequently, the Court affirms the ALJ's finding that Plaintiff's mental

health condition does not manifest a moderate degree of impairment with respect to the mental work-related tasks of social interactions, responding appropriately to usual work situations, or tolerating routine work-setting changes.

## II.     The Finding of Moderate Impairment at Step Three

At Step Three of the disability analysis, the ALJ credited Plaintiff as having a moderate degree of impairment in the broad domain of concentration, persistence, or pace. Plaintiff complains that the RFC assessment does not take this particular limitation into consideration. However, Plaintiff does not explain *how* "her RFC assessment does not take this limitation into consideration." ECF 11 at 8. The ALJ found the claimed mental health condition to rise to the level of a "severe impairment" for Step Two purposes, and as such, the ALJ expressly analyzed its impairing effects on her ability to work at Step Four of the disability analysis. As 20 C.F.R. § 404.1520a and SSR 96-8p emphasizes and upon which Plaintiff relies, the PRT findings at Step Three do not directly translate to an RFC assessment. Rather, the RFC assessment involves a more thorough consideration. The ALJ did not simply rely on an RFC restriction to unskilled work as an automatic way to account for the Step Three PRT finding of a moderate impairment of concentration, persistence, or pace. To the contrary, the ALJ drew the required link between the PRT finding and the RFC assessment.

To begin with, the PRT finding at Step Three was in reference to concentration, persistence, and pace in the context of a *broad* functional domain. The ALJ's finding at that step did not capture the distinction between concentration, persistence, and pace at the complex and basic levels, as the medical sources did. Nothing of the Decision suggests that the ALJ found a moderate impairment of concentration, persistence, and pace below the complex level. The medical sources themselves did not opine as such, finding just mild impairment of basic work demands. Moreover, the ALJ's

18

Step Three finding was especially qualified. The ALJ credited a moderate degree of impairment as a way of giving Plaintiff the benefit of the doubt, despite the fact that "her psychological symptoms" were "generally [under] good control" and with "no significant abnormalities in this area." ECF 5 at 21.

Moreover, the ALJ translated the PRT finding into work-related terms for purposes of the RFC assessment. The ALJ limited Plaintiff "to tasks that can be learned in six months." *Id*. at 22. Plaintiff argues that it is "a limitation in understanding, remembering, and applying information" (ECF 11 at 9), and thus unrelated to concentration, persistence, and pace. However, the medical sources (to whom Plaintiff contends the ALJ should have given full weight) did not characterize it as such. Both medical advisors found Plaintiff "able to persist at tasks that can be learned in up to six months on the job," (*id*. at 82, 103), thereby placing it in the context of concentration, persistence, and pace.

As such, contrary to Plaintiff's conclusory argument, the RFC assessment does properly account for the PRT finding at Step Three. The Court sees no legal error in how the ALJ assessed Plaintiff's RFC, and the RFC assessment enjoys the support of competent, substantial evidence. The ALJ next proceeded to present those work-related impairments to a vocational expert for consideration. The vocational expert identified both past relevant work and less demanding other kinds of jobs that a person with that RFC and Plaintiff's vocational profile could perform.

## CONCLUSION

Having reviewed the parties' arguments and having independently reviewed the entire record, the Court finds the ALJ's decision to enjoy evidentiary support and consistent with governing law. Consequently, the Court sees no grounds warranting reversal or remand.

Accordingly, the ALJ's determination that Plaintiff is not disabled is AFFIRMED. The Clerk of Court shall enter judgment in Defendant's favor and shall close this civil action.

Entered this 10th day of November, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge